**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.: 18-207 (RC) |
| | : | |
| HARSHIA JOHNSON, | : | Re Document No.:     11 |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE

## I. INTRODUCTION

In the early morning hours of May 6, 2018, Officers Dennis Sfoglia and Nizam Ahmed of the Washington, D.C. Metropolitan Police Department ("MPD") arrived at the scene of a suspected drive-by shooting to find Defendant Harshia Johnson lying in the street. By the time the officers had gotten out of their squad car, Johnson was on his feet and walking away, but the officers noticed that he was leaning slightly to his left and that his left arm was tucked against his side. Fearing that Johnson may have been shot, the officers' initial response was perfectly sensible. They approached Johnson and instructed him to come toward them, which he did. They asked Johnson if he had been shot; he responded that he had not. They looked at Johnson's hands and arms; they saw no signs of a gunshot wound. Nonetheless, within seconds, instead of asking Johnson additional questions to ensure he was uninjured, one of the officers proceeded to grab and pull on Johnson's left arm—the arm that was pressed against his side. Eventually, the officer succeeded in moving Johnson's arm outward and away from his body, which exposed Johnson's inner jacket pocket, as well as the gun held inside of it.

For purposes of the Fourth Amendment, this was a search—and one that, as the Court will explain below, lacked objective justification. Indeed, the government has failed to demonstrate that the search was a reasonable exercise of the officers' community caretaking functions, or that it was based on a reasonable suspicion that Johnson was armed and dangerous. The Court therefore concludes that the search was unconstitutional and grants Johnson's motion to suppress all physical evidence subsequently obtained.

## II. FACTUAL BACKGROUND

At around 1:10 am on May 6, Officer Sfoglia and Officer Ahmed were in their squad car when Officer Ahmed received a notification on his phone from an installed Shot Spotter application, designed to alert MPD officers when the sounds of gunshots have been detected in their assigned areas of patrol. *See* Rough Transcript of Nov. 18, 2018 Hearing ("Hearing Tr.") at 6, 8, 11. This particular alert indicated that three distinct shots had been heard on the 3700 block of Horner Place SE—just a few blocks away from Officer Sfoglia and Officer Ahmed's location at the time. *Id.* at 14–15. Then as the officers began to drive to Horner Place, they received a radio call from their district dispatcher reiterating that three gunshots had been detected on Horner's 3700 block. *Id.* at 14–17; Audio of Radio Call, Gov't's Ex. 5. The dispatcher added that, based on the Shot Spotter application's sensors, the source of the gunshots appeared to be moving at twenty-eight miles per hour, indicating that this had been a drive-by. Hearing Tr. at 17; Audio of Radio Call, Gov't's Ex. 5.

Officer Sfoglia and Officer Ahmed arrived at the scene within a few minutes, and as they pulled up, they claim to have seen a man—later identified as Harshia Johnson—lying in the street and "in the process of getting up." Hearing Tr. at 18; *see also id.* at 50. For purposes of Johnson's motion to suppress, this is the only factual issue in dispute: Johnson denies ever being

on the ground.  *See id.* at 52–54, 63.  Both Officer Sfoglia's and Officer Ahmed's body camera footage from this time is available, but it is of no use on this issue because, as both officers were still seated in the squad car at the time, the footage shows only the car's interior.

The body camera footage does, however, make clear that, by the time the officers exited the car, Johnson was on his feet and walking away from them across the street.  *See* Ahmed Body-Worn Camera Footage ("Ahmed BWC") at 2:00–2:04, Gov't's Ex. 2.  Johnson was, according to Officer Ahmed's later testimony, leaning slightly to his left and holding his left forearm at roughly a ninety degree-angle, with his left elbow tucked closely to his side.  *See* Hearing Tr. at 20.  As Officer Ahmed put it, "it appeared as if [Johnson] was shot in the arm." *Id.*  At this time, the body camera footage shows that Officer Sfoglia began to follow Johnson across the street and said, "Yo, come here for a second."  Ahmed BWC at 2:00–2:04.  Officer Ahmed, who was walking behind Officer Sfoglia, then briefly shined his flashlight on Johnson, and as he did so, Officer Sfoglia said, "Hey"—raising the volume of his voice a touch.  *Id.* at 2:04.  As Johnson began to turn around, Officer Sfoglia repeated, "Come here."  *Id.* at 2:05. Johnson responded by taking a few steps toward the officers, during which time Officer Sfoglia said, "Let me see your hands," following up a second later with, "Did you get shot?"  *Id.* at 2:08.

Johnson responded, "No, I didn't," and he and Officer Sfoglia continued to walk toward one another.  *Id.* at 2:08–2:10.  By the time Officer Sfoglia replied, "You didn't?," he and Johnson were just a few feet apart.  Sfoglia Body-Worn Camera Footage ("Sfoglia BWC") at 00:15, Gov't's Ex. 1.  Officer Ahmed joined them within a couple of seconds and stood to Officer Sfoglia's left.  *See* Ahmed BWC at 2:14.  In compliance with Officer Sfoglia's earlier instruction, Johnson had stretched out his right hand so that the officers could examine it. Sfoglia BWC at 00:16.  He was wearing an unzipped, black leather jacket over a black t-shirt.

Officer Sfoglia briefly put his left hand on the outside of Johnson's jacket at the right bicep, looked at the right hand, then pointed to Johnson's left arm, and repeated, "Let me see your hand." *Id.* at 00:16–00:20. Johnson responded by turning his body so that Officer Sfoglia could see his left side. *Id.* at 00:20–22. His left arm remained in the same position the officers had noticed when they got out of their car—elbow tucked into his side and forearm at roughly a ninety-degree angle. Ahmed BWC at 2:15–2:16. With his hand unclenched and resting several inches in front of his abdomen, it was as if Johnson was wearing an invisible sling. *Id.*

As soon as Johnson showed his left arm, Officer Sfoglia began pulling on Johnson's jacket sleeve at the wrist while Officer Ahmed shined his flashlight on Johnson's left side. *Id.* at 2:16. Johnson resisted this pulling and kept his arm in the same position, after which Officer Sfoglia asked, "You can't put the hand down?" *Id.* at 2:17. Officer Sfoglia continued to tug at Johnson's sleeve, and eventually, Johnson's arm moved outward. *Id.* at 2:17–2:19. When Johnson's arm shifted, the area on his left side between his jacket and shirt became visible to Officer Ahmed. His flashlight still on, Officer Ahmed's eyes "locked onto the handle of [a] gun" held in Johnson's inner jacket pocket. Hearing Tr. at 24; Ahmed BWC at 2:18–2:19. As this happened, the pulling on Johnson's sleeve also caused his torso to rotate to his left, exposing the inside of Johnson's left side to Officer Sfoglia. Ahmed BWC at 2:18–2:20. Noticing Officer Ahmed's reaction, Officer Sfoglia looked down, saw the gun himself, and yelled "gun" four times. *Id.* The two officers then together took Johnson to the ground and arrested him. *Id.* at 2:25–2:26.

After the officers handcuffed Johnson, they recovered the gun that they had spotted—a loaded Glock 19, 9mm semi-automatic pistol. *See* Indictment at 1, ECF No. 1. Johnson also later underwent a search incident to his arrest, during which a pill bottle containing multiple clear

bags of cocaine was found on his person, in addition to around 370 dollars in cash. Ultimately, Johnson was indicted on three counts: (1) unlawful possession of a firearm and ammunition by a person convicted of a felony, in violation of 18 U.S.C. § 922(g)(1); (2) possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); and (3) using, carrying, and possessing a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1). *See* Indictment at 1–2.

Presently before the Court is Johnson's motion to suppress all physical evidence seized during his encounter with the police on May 6. As Johnson sees it, Officer Sfoglia and Officer Ahmed violated his Fourth Amendment rights when they stopped and searched him on the street without a warrant. Johnson therefore contends that the gun that was recovered must be excluded, because it constitutes evidence obtained as a direct result of the officer's illegal actions. And because the gun is what provided the officers probable cause to arrest him, Johnson argues that the arrest was illegal too, meaning the evidence recovered during his arrest—the pill bottle, drug evidence, and cash—must be excluded as "fruit of the poisonous tree."[1] *E.g.*, *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).

### III.  ANALYSIS

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Violations of this guarantee are generally subject to the exclusionary rule, which requires courts to suppress evidence obtained through unconstitutional means. *E.g.*, *United States v. Weaver*, 808 F.3d 26, 33 (D.C. Cir. 2015) (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961) and *Weeks v.*

---

[1] The Court held an evidentiary hearing on Johnson's motion on November 15, 2018, during which both parties' submitted exhibits and Officer Ahmed provided sworn testimony.

*United States*, 232 U.S. 383, 398 (1914)).  When it applies, "the exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'"  *Strieff*, 136 S. Ct. at 2061 (quoting *Segura*, 468 U.S. at 804).

"Typically, '[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.'"  *United States v. Jones*, 142 F. Supp. 3d 49, 56 (D.D.C. 2015) (alteration in original) (quoting *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)).  But when a defendant has been seized or searched without a warrant, "the burden shifts to the government to justify the warrantless" action.  *Id.* (quoting *United States v. Jones*, 374 F. Supp. 2d 143, 147 (D.D.C. 2005)).  This is because "searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate," are usually deemed "*per se* unreasonable" for purposes of the Fourth Amendment— "subject only to a few specifically established and well delineated exceptions."  *United States v. Vinton*, 594 F.3d 14, 19 (D.C. Cir. 2010) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993)).  And the burden is on the government to establish that its claimed exception, or exceptions, apply.  *See Jones*, 142 F. Supp. 3d at 56 (citing *United States v. Jeffers*, 342 U.S. 48, 51 (1951)).

As already noted, Johnson's motion here focuses entirely on the events preceding his arrest.  He contends that Officer Sfoglia and Officer Ahmed violated his Fourth Amendment rights when they seized him on the street and searched him without a warrant.  But he argues that the exclusionary rule requires that the Court suppress all of the physical evidence that the police obtained from him.  The gun, Johnson asserts, is primary evidence obtained directly from the

illegal conduct, while the remaining evidence—the pill bottle, the drug evidence, and the cash—constitute fruit of the poisonous tree.

In response, the government argues that two different exceptions justify the officers' conduct during their initial interaction with Johnson. The first is the infrequently invoked "community caretaking exception," which has been described, in general terms, as "a catchall" that can be used to justify police action taken pursuant to the "wide range of responsibilities that . . . officers must discharge aside from their criminal enforcement activities." *Matalon v. Hynnes*, 806 F.3d 627, 634 (1st Cir. 2015) (quoting *United States v. Rodriguez-Morales*, 929 F.2d 780, 785 (1st Cir. 1991)). The second is the far more familiar *Terry* exception, which permits a police officer to (1) briefly stop and detain a person for investigative purposes if the officer has a reasonable suspicion that "criminal activity may be afoot," and (2) conduct a limited pat-down search if the officer has a reasonable suspicion that the person is "armed and presently dangerous to the officer or to others." *Minnesota v. Dickerson*, 508 U.S. 366, 372–73 (1993) (quoting *Terry v. Ohio*, 392 U.S. 1, 24, 26, 30 (1968)).

But before invoking either of these exceptions, the government argues that the officers' actions do not trigger Fourth Amendment scrutiny in the first place. No search or seizure occurred in this case, the government contends, because Johnson consented to his encounter with the officers up until the point that the gun was discovered in plain view, at which time probable cause arose to lawfully arrest him.

As explained below, none of the government's arguments are persuasive. The officers' conduct constituted both a seizure and a search for Fourth Amendment purposes. And though the seizure may have been reasonable under the community caretaking exception, neither of the government's invoked exceptions render the search reasonable. The Court therefore grants

Johnson's motion and suppresses the physical evidence that the government obtained as a result of the search.

## A. Whether a Seizure and/or Search Occurred

"The threshold inquiry in any Fourth Amendment analysis is whether the government's conduct is included in the Amendment's coverage, [or] in other words, whether it amounts to a 'search' [or seizure] for constitutional purposes." *Parker v. District of Columbia*, 293 F. Supp. 3d 194, 201 (D.D.C. 2018) (second alteration in original) (quoting *United States v. Gonzalez*, 328 F.3d 543, 546 (9th Cir. 2003)). "A search 'occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.'" *United States v. Miller*, 799 F.3d 1097, 1102 (D.C. Cir. 2015) (emphasis omitted) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). And a seizure "occurs when a person's freedom of movement is terminated or restrained, either by physical force or a show of authority." *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 273–74 (D.D.C. 2011) (citing *Brendlin v. California*, 551 U.S. 249, 254 (2007)).

According to the government, a seizure did not take place here because Johnson's freedom of movement was not restrained. Rather, as the government sees it, "the officers engaged in a consensual encounter with [Johnson] when they approached him on a public street and asked him whether he was okay." *See* Gov't's Resp. to Def.'s Mot. to Suppress ("Gov't Resp.") at 5–6, ECF No. 15. And the government argues that a search did not occur because, once that consensual interaction had begun, Johnson "voluntarily allowed the officers to examine his arm, at which point they saw in plain sight the firearm in [his] pocket," providing them probable cause to arrest him. *Id.* at 6; *see also, e.g.*, *Payton v. New York*, 445 U.S. 573, 586 (1980) ("The seizure of property in plain view involves no invasion of privacy and is

presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.").

No part of the government's argument is supported by the evidence, though. The Court has little trouble concluding that both a seizure and a search occurred. As alluded to above, whether the initial stop constituted a seizure hinges on whether the officers' actions amounted to a "show of authority," *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015) (quoting *Terry*, 392 U.S. at 19 n.16), such that "a reasonable person would have believed that he was not free to leave," *id.* at 787 (quoting *United States v. Maragh*, 894 F.2d 415, 418 (D.C. Cir. 1990)). Whether there was a show of authority in turn depends on a number of factors, including the time and place of the encounter, the language and tone of the officers' voices, and whether the officers displayed their weapons, wore uniforms, or restricted Johnson's movement. *United States v. Castle*, 825 F.3d 625, 632–33 (D.C. Cir. 2016).

These factors overwhelmingly weigh in favor of the conclusion that Johnson was seized when the officers initially stopped him. The officers arrived on the scene in a marked, police squad car, and they were wearing uniforms—Officer Sfoglia's jacket even had "POLICE" emblazoned on it in large, bold lettering. *E.g.*, Ahmed BWC at 2:09; Hearing Tr. 40–41. When Officer Sfoglia spoke to Johnson, his sentences were phrased, not as questions, but as commands. Indeed, in a stern tone of voice, Officer Sfoglia twice *told* Johnson to "Come here," then twice instructed Johnson to "Let me see your hand(s)." Ahmed BWC at 2:00–2:20. It was also late at night, and, after Johnson did not at first respond to the officers, Officer Ahmed shined his flashlight at him. Ahmed BWC at 2:04. Johnson was arguably seized as soon as the flashlight was shone on him, as the Court thinks it unlikely that any reasonable person would have felt free to ignore the officers at that time. *Cf. United States v. Jones*, 584 F.3d 1083, 1087

(D.C. Cir. 2009) (government conceding that officer seized individual when officer approached him at night, ordered him to "Come here," and "reverse his line of travel"). But if there were any lingering doubts, Officer Sfoglia then got within an arm's length of Johnson and immediately placed his hand on Johnson's right bicep. Sfoglia BWC at 00:16–00:19. Once physical contact was initiated, Johnson's freedom of movement was restricted, and no reasonable person would have felt free to leave. No later than that moment of first physical contact, Johnson became seized for purposes of the Fourth Amendment. *See Castle*, 825 F.3d at 633 (concluding that individual was seized when officer "touched" him on his arm, "instructed him to 'hold on,'" and individual complied).

The officers' search of Johnson then quickly followed. As an initial matter, contrary to the government's assertions, the gun was never in plain view. As the body camera footage and Officer Ahmed's testimony both make clear, the gun became visible only after Officer Sfoglia had grabbed Johnson's left arm and lifted it up. The footage shows that Officer Sfoglia pulled on Johnson's jacket sleeve at the wrist until the arm moved outward, exposing the area between his jacket and t-shirt, including his inner jacket pocket, which held the gun. Ahmed BWC at 2:16–2:20. And Officer Ahmed testified that "[i]t was after the left arm was raised up, [when] . . . Johnson's jacket flared open, [that] [he] observed the handle of the firearm." Hearing Tr. at 49.

The question, then, is whether pulling at Johnson's sleeve and moving his arm constituted a search within the meaning of the Fourth Amendment—or, in other words, whether doing so infringed on "an expectation of privacy that society is prepared to consider reasonable." *Miller*, 799 F.3d at 1102 (emphasis omitted) (quoting *Jacobsen*, 466 U.S. at 113). The answer to that question is easy. As the D.C. Circuit has said, "[w]hen a government agent unfastens, lifts, pulls down, pats, or otherwise manipulates clothing to reveal or determine what lies underneath, that

manipulation necessarily involves the sort of 'probing into an individual's private life'" that is indicative of a search, even if the physical intrusion is only "minimal." *United States v. Askew*, 529 F.3d 1119, 1128 (D.C. Cir. 2008) (en banc) (internal quotation marks omitted) (quoting *United States v. Dionisio*, 410 U.S. 1, 15 (1973)). This is an apt description of what the officers did here: they lifted and pulled Johnson's sleeve to reveal what was underneath. For purposes of the Fourth Amendment, that is a search—a relatively uninvasive one, but a search nonetheless.[2] *Cf. Askew*, 529 F.3d at 1127–28 (holding that officers' partial unzipping and opening of person's jacket to reveal sweatshirt underneath "[c]learly" was a search because "[t]he involuntary opening of someone's clothing reveals to the world at large . . . what [the] individual obviously intends to keep private").

## B. The Reasonableness of the Seizure and Search

With the Court having concluded that a warrantless seizure and search occurred here, the burden is on the government to demonstrate that its conduct was reasonable for purposes of the Fourth Amendment. The critical issue, of course, is the legality of the search, as it was the search that led directly to the officers' discovery of the gun. The constitutionality of the seizure is not irrelevant to the analysis, however. Under the fruit of the poisonous tree doctrine mentioned above, evidence obtained following an illegal seizure generally must be excluded unless the government shows (1) that the evidence would have been discovered inevitably, (2) that the evidence was discovered from a separate, independent source, or (3) that the discovery

---

[2] To the extent that the government contends that Johnson consented to be searched, that argument fails too. It is true that consent can constitute an exception to the Fourth Amendment's warrant requirement under certain circumstances. *See United States v. Delaney*, 651 F.3d 15, 18 (D.C. Cir. 2011). But, here, the only fact from which the Court could possibly infer Johnson's consent to a search would be that he did not vocally resist the search. And "[i]t is clear . . . that for constitutional purposes nonresistance may not be equated with consent." *United States v. Most*, 876 F.2d 191, 199 & n.17 (D.C. Cir. 1989).

of the evidence was so attenuated from the illegal seizure that the taint of the unlawful police conduct was dissipated. *See, e.g.*, *Strieff*, 136 S. Ct. at 2061; *United States v. Holmes*, 505 F.3d 1288, 1293–94 (D.C. Cir. 2007). There is no basis for concluding that any of these three exceptions apply in this case, and the government makes no such argument. Thus, for purposes of Johnson's motion to suppress, the government must establish that *both* the initial seizure and the subsequent search were constitutional.

### 1. Community Caretaking

The government first argues that the stop and search were constitutional based on the community caretaking doctrine. As the government sees it, the officers' actions were reasonable because, under the circumstances, they had a duty to make sure Johnson was not shot and in shock, or otherwise injured.

The community caretaking doctrine has its origins in the Supreme Court's decision in *Cady v. Dombrowski*, 413 U.S. 433 (1973). There, a Chicago police officer—Dombrowski— had been detained after he was involved in a single-vehicle accident in Wisconsin. *Id.* at 435– 36. While Dombrowski was in custody, police in Wisconsin had his car towed to a private lot and subsequently searched the car without a warrant. *Id.* at 436. Under the belief that Chicago police officers were required to carry their service weapons at all times, the Wisconsin officers were worried "for the safety of the general public who might be endangered if an intruder removed a revolver" from the vehicle while it remained at the lot. *Id.* at 447, *see also id.* at 437. The search of the vehicle uncovered no gun, but the Wisconsin officers did find evidence of a possible homicide, of which Dombrowski was later convicted. *Id.* at 437, 439. The Supreme Court ultimately held that Dombrowski's Fourth Amendment rights were not violated by the warrantless search of the car because the search was a reasonable exercise of the Wisconsin

officers' "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441.

Nearly five decades after *Cady*, the scope of the "community caretaking exception" remains a subject of debate. Some courts, for example, have limited the exception's application to cases involving cars, and the D.C. Circuit left that question open just a few years ago. *See Corrigan v. District of Columbia*, 841 F.3d 1022, 1034 (D.C. Cir. 2016) (citing *United States v. Erickson*, 991 F.2d 529, 532 (9th Cir. 1993) and *United States v. Pichany*, 687 F.2d 204, 207–09 (7th Cir. 1982)). But the Court does not view this uncertainty as fatal here, as other circuits have extended the exception to cases involving individuals in certain situations. *See, e.g.*, *Vargas v. City of Phila.*, 783 F.3d 962, 972 (3d Cir. 2015); *Lockhart-Bembery v. Sauro*, 498 F.3d 69, 75–76 (1st Cir. 2007); *United States v. Garner*, 416 F.3d 1208, 1212–13 (10th Cir. 2005); *Winters v. Adams*, 254 F.3d 758, 763–64 (8th Cir. 2001); *United States v. Rideau*, 949 F.2d 718, 720 (5th Cir. 1991), *vacated on other grounds*, 969 F.2d 1572 (en banc).

Based on the circumstances here, the Court thinks it was a reasonable exercise of the officers' community caretaking functions to briefly stop Johnson in a manner that amounted to a seizure under the Fourth Amendment. According to Officer Ahmed's testimony—which the Court credits—the officers arrived on the scene of a suspected drive-by shooting to find Johnson lying in the street. Hearing Tr. at 18. And after Johnson got to his feet, the officers observed him holding his left arm in a manner suggesting that he may have been shot. Hearing Tr. at 20. Under these circumstances, it was reasonable for the officers to approach Johnson and briefly question him to ensure that he was not injured, even if Johnson himself did not want to talk. It likely would have been irresponsible, actually, for the officers to ignore the situation, as they had an obligation to protect the safety of members of the community. *See, e.g.*, *United States v.*

*Coccia*, 446 F.3d 233, 238 (1st Cir. 2006); *United States v. Collins*, 321 F.3d 691, 695 (8th Cir. 2003). Because the officers' initial stop was reasonably aimed at ensuring Johnson's safety—a goal "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," *Cady*, 413 U.S. at 441—the brief seizure falls squarely within the community caretaking exception.

As the Court explained above, however, the government must also justify the officers' search of Johnson, and the search is a different matter. Given the evidence presented, the Court is unable to conclude that it was reasonable for the officers to start grabbing Johnson's clothing and moving his arm within seconds. Everything the officers had learned during the initial stop had indicated that Johnson was not shot: Johnson had said that he was not shot, and there were no signs of a gunshot wound anywhere on the outside of his clothing. In other words, based on the brief seizure, the officers' concern for Johnson's safety should have begun to diminish—not dissipate entirely, but diminish.

Also, assuming Johnson had been shot or that he was injured in some other way, it is the government's burden to show that moving Johnson's arm was a reasonable exercise of the officers' community caretaking responsibilities. *See Jones*, 142 F. Supp. 3d at 56 (citing *Jeffers*, 342 U.S. at 51). But in opposing Johnson's motion, the government did not even have the officer who initiated the search—Officer Sfoglia—testify. And when Officer Ahmed—the officer who did testify—was asked why Officer Sfoglia had pulled on Johnson's arm, he answered that he was "not sure." Hearing Tr. at 25–26. Without more, the Court is left hypothesizing as to what medical purpose this search served. That shows that the government has not met its burden. On this record, the Court thinks that it would have been reasonable for the officers to ask further questions to ensure that Johnson was uninjured. But the Court is

unable to see how, as an exercise of the officers' community caretaking functions, it was reasonable to ratchet things up and move Johnson's arm.

In fact, the Court is aware of no case that supports such a broad conception of the community caretaking exception. Even the courts that have applied the exception more liberally have stressed that it is not a blank check. Rather, it requires courts to "balance the governmental interest in the police officer's exercise of his or her 'community caretaking function' and the individual's interest in being free from arbitrary government interference." *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993). "The scope of the encounter must [also] be carefully tailored to satisfy the purpose of the initial detention, and the police must allow the person to proceed once the officer has completed [his or her] inquiry, unless, of course, the officer obtains further reason to justify the stop."[3] *United States v. Harris*, 747 F.3d 1013, 1017 (8th Cir. 2014); *see also Garner*, 416 F.3d at 1213 (A community caretaking detention "must last no longer than is necessary to effectuate its purpose, and its scope must be carefully tailored to its underlying justification. Once the officer has completed the inquiry necessary to satisfy the purpose of the initial detention, he or she must allow the person to proceed unless the officer has a reasonable suspicion of criminal conduct." (citations omitted)).

In light of these general principles, courts do not typically contemplate *searches* of individuals being justified by the community caretaking exception; the cases speak primarily of

---

[3] This is not to say that "officers must select the *least intrusive* means of fulfilling community caretaking responsibilities." *Lockhart-Bembery*, 498 F.3d at 76 (emphasis added). The Court imposes no such requirement. Here, for example, it is possible that the officers may have been able to accomplish their community caretaking duties without seizing Johnson at all. They could have at least attempted, for instance, to get Johnson's attention and speak to him without demonstrating a "show of authority." But the Court does not require that the government establish that a seizure was *necessary* here. It is sufficient that the seizure was *reasonable*.

seizures.  *See, e.g.*, *Vargas*, 783 F.3d at 971–72; *Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir. 2006); *King*, 990 F.2d at 1560.  And the cases that arguably go beyond seizures are easily distinguishable from this case.  The government, for example, relies on *Vauss v. United States*, 370 F.2d 250 (D.C. Cir. 1966) (per curiam),[4] but that case involved a defendant who was found unconscious on a public street.  *Id.* at 251.  After police officers unsuccessfully attempted to rouse the man, they called an ambulance and then searched him in the hopes of finding a form of identification that would help the officers "prepare a report for the hospital."  *Id.*  The search instead uncovered drugs, though, and when the defendant later sought to suppress the drug evidence, the D.C. Circuit refused.  The court concluded that "[a] search of one found in an unconscious condition is both legally permissible and highly necessary" because "[t]here is a positive need to see if the person is carrying some indication of a medical history, the rapid discovery of which may save his life."  *Id.* at 252.  At the risk of stating the obvious, here, Johnson was not unconscious, so the risk that the officers were addressing was not nearly as serious as that at issue in *Vauss*.  And as the Court has already said, everything the officers initially learned from Johnson should have led them to become *less* concerned about his wellbeing, whereas in *Vauss*, the officers surely would have become more concerned after they were unable to awaken the defendant.  Thus, it was reasonable in *Vauss* for the officers to ramp up the encounter and perform a limited search.  Here, it was not.

---

[4] As *Vauss* predates *Cady*, it never used the phrase "community caretaking."  The Court assumes, without deciding, that it is properly viewed as a community caretaking case, but the Court also notes that *Vauss*'s reasoning is arguably more consistent with the application of what is now usually referred to as the "emergency aid doctrine," which the Supreme Court has framed as a subset of the exigent circumstances exception, *see Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  The government does not invoke the exigent circumstances exception or the emergency aid doctrine in this case.

The government also relies on the Eight Circuit's decision in *Harris*, but that case involved an unconscious person as well. The individual at issue there was found asleep in the middle of the day at a bus station with a gun "sliding" out of his pants pocket. *Harris*, 747 F.3d at 1016. Without even conducting a search, then, the police officers had reason to be "[c]oncerned that the man might wake up and attempt to use the handgun or that the handgun could fall out of the man's pants pocket and accidentally discharge." *Id.* The officers therefore removed the gun from the man's pocket before waking him up. *Id.* This response was reasonable, the Eight Circuit held, "[i]n light of the risks [the] exposed and unguarded firearm posed." *Id.* at 1018–19. Here, of course, Johnson did not pose the same kind of risk to himself or degree of danger to others: he was neither unconscious nor mishandling a firearm in plain view. And yet, Officer Sfoglia and Officer Ahmed undertook a more invasive search than the officers in *Harris* performed. Thus, if anything, *Harris* actually supports Johnson's position here. It shows that, to borrow the Eighth Circuit's words, "[t]he scope of th[is] encounter" was not "carefully tailored to satisfy the purpose of the initial detention."[5] *Id.* at 1017.

_____

[5] Though it does not rely as heavily on it, the government also cites the Tenth Circuit's decision in *Garner*. But importantly, the issues presented to the court there did not involve any alleged search of the defendant. *See* 416 F.3d at 1211–12. Instead, *Garner* involved the prolonged seizure of an intoxicated man who had been found lying down in a field. The Tenth Circuit, like the Court here, concluded that an initial, brief seizure was justified under the community caretaking exception after the defendant at first attempted to walk away from the police officers who approached him. *Id.* at 1214–15. Then in *Garner*, during the initial detention, the defendant tried to walk away from the officers again, and the officers responded by ordering him to sit back down. *Id.* at 1216. This continued detention, the Tenth Circuit concluded, was reasonable "[i]n light of the information that Mr. Garner had been sitting and lying in the field for several hours (which suggested that he might be a risk to himself or others and that he might have violated the Utah public intoxication statute), Mr. Garner's continuing nervous behavior, and his moving his hands in and out of his pockets." *Id.* This case obviously never got to the point of a prolonged detention, and it does not involve any of the above-mentioned facts that were present in *Garner*.

## 2. *Terry*

The government next argues that the moving of Johnson's arm constituted a legally permissible *Terry* search. "Under *Terry* and its progeny, a police officer may perform a protective frisk [or pat-down search] if he has reason to believe, based on 'specific and articulable facts . . . taken together with rational inferences from those facts,' that 'he is dealing with an armed and dangerous individual.'"[6] *United States v. Holmes*, 385 F.3d 786, 789 (D.C. Cir. 2004) (quoting *Terry*, 392 U.S. at 21, 27). Here, of course, there is no evidence that the officers actually believed that Johnson was armed prior to searching him. The officers' subjective intentions are not dispositive, however. *See, e.g.*, *United States v. Brown*, 334 F.3d 1161, 1167 (D.C. Cir. 2003). The analysis is instead objective. It requires the Court to look at the events leading up to the search and then ask "whether [those] historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion" that Johnson was armed and dangerous. *Id.* at 1164 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

The historical facts that the government cites here are (1) that Johnson was present in a high-crime area, where (2) a suspected shooting had recently taken place; (3) that Johnson "initially attempted to flee from the officers" when they first arrived; and (4) that Johnson was holding his arm to his side, as the Court has already described. Gov't Resp. at 12; *see also* Hearing Tr. at 67. Beginning with the first fact, that all of this occurred in a high crime neighborhood is undoubtedly relevant, but "an individual's presence in such an area, 'standing

---

[6] As the Court mentioned earlier, *Terry* also permits a police officer to briefly stop and detain a person for investigative purposes if the officer has a reasonable suspicion that "criminal activity may be afoot." *Dickerson*, 508 U.S. at 373. But because the Court has already decided that the officers' seizure here was justified under the community caretaking exception, it need not decide whether the seizure constituted a lawful *Terry* stop.

alone, is not [even] enough to support reasonable, particularized suspicion that the person is committing a crime'"—which is obviously a less demanding standard than showing that the person is armed and dangerous. *Brown*, 334 F.3d at 1165 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). Indeed, "[e]ven in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990). As for the government's argument that a suspected shooting had just taken place in the area, its probative value is limited under the facts of this case too. By all indications, the recent shooting had been a drive-by. The officers therefore had no reason to believe that Johnson himself was the shooter—that person had likely already fled the scene. Thus, while it is no doubt relevant that this was a high-crime neighborhood where a suspected crime had recently taken place, the government needs more to justify the officers' search. It needs facts that are particularized to Johnson.

To that end, the government contends that Johnson initially tried to flee when the officers arrived. But the Court finds that argument unsupported by the evidence. Although the beginning of the body camera footage shows Johnson walking away, he was not moving very fast, and he promptly turned around to acknowledge the officers after the flashlight was shone on him. In his testimony, Officer Ahmed did not characterize this as an attempt to flee, and the Court would not characterize it as an attempt to flee either. Without more, the Court is left with this: "Merely walking away, even quickly . . . upon the arrival of [a] uniformed police officer" does not "provide articulable suspicion of criminal wrongdoing." *United States v. Jones*, 584 F.3d 1083, 1087 (D.C. Cir. 2009). It moves the needle even less in a case like this, where the government's burden is to show reasonable suspicion that Johnson was armed and dangerous.

The positioning of Johnson's arm is admittedly a more challenging subject. It was certainly awkward-looking, and with the benefit of hindsight, one can see how it may have had the effect of concealing Johnson's inside pocket. But though "a police officer is not required to possess the clarity of vision that arises only in hindsight," *United States v. Pontoo*, 666 F.3d 20, 28 (1st Cir. 2011), hindsight also does not validate actions that were unreasonable when they were taken. *Cf. Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). The question is whether, based on the information available at the time, an objectively reasonable officer would have found Johnson's arm positioning indicative of concealment. And, again, it is the government's burden to make that showing. *See, e.g.*, *Castle*, 825 F.3d at 634.

Here, the Court is presented with little to no evidence that a reasonable officer would have, based on training and expertise, viewed this position as suggestive of someone concealing a weapon. Instead, all indications are that a reasonable officer would have thought Johnson was injured. Officer Ahmed, in fact, repeatedly testified that he and Officer Sfoglia did *not* interpret the position of Johnson's arm to be indicative of concealment. *See, e.g.*, Hearing Tr. at 21, 23, 27. Rather, prior to searching him, they never thought he was "anybody other than a victim of a crime." *Id.* at 27. As the Court has said, the officers' subjective motives are not dispositive, but in this case, Officer Ahmed's testimony is essentially the only evidence the Court has of what an objectively reasonable police officer would have thought.

That Johnson's arm position had an apparent, wholly innocent explanation distinguishes this case from others where reasonable suspicion was present based on possible concealment.

Johnson did not, for example, respond to the sight of the officers by needlessly "pressing the front of his body" against a vehicle. *United States v. Dortch*, 868 F.3d 674, 680 (8th Cir. 2017). He did not have his hand "awkwardly inserted halfway in his . . . pocket, 'cupped' as if 'grasping an object.'" *United States v. Black*, 525 F.3d 359, 365 (4th Cir. 2008).[7] Nor was he wearing bulky or heavy clothing that was "conspicuously inappropriate for the weather." *Dortch*, 868 F.3d at 680. And it certainly was not as if Johnson's pants were unbuttoned, which the D.C. Circuit has observed "naturally creates a reasonable fear that [a] suspect might be in the process of trying to conceal a weapon there." *United States v. Bullock*, 510 F.3d 342, 348 (D.C. Cir. 2007).

To be sure, a reasonable suspicion determination "need not rule out the possibility of innocent conduct" entirely. *Brown*, 334 F.3d at 1168 (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)). But the likelihood of innocence diminishes when multiple particularized, suspicious factors are present, even if each factor alone could be "susceptible of innocent explanation." *See Arvizu*, 534 U.S. at 277. Here, by contrast, there was a highly plausible innocent explanation for the only particularized fact on which the government is able to rely. Thus, although the positioning of Johnson's arm certainly has some relevance, it was not sufficient, under the totality of these circumstances, to create reasonable suspicion to believe that Johnson was armed and dangerous. The officers therefore were not justified in searching Johnson under *Terry*. The search was a violation of the Fourth Amendment.

---

[7] *See also Black*, 525 F.3d at 367 (Gregory, J., dissenting) ("[A] 'cupped' hand is nothing more than a relaxed hand and cannot create the sort of reasonable articulable suspicion required to justify a police search and seizure.").

### C. Application of the Exclusionary Rule

Having concluded that a Fourth Amendment violation occurred here, the Court's only remaining task is to determine what evidence is subject to the exclusionary rule. As the Court said earlier, the rule applies to both the primary evidence obtained directly from the illegal search and the evidence subsequently obtained that is "derivative of [the] illegality." *Strieff*, 136 S. Ct. at 2061 (quoting *Segura*, 468 U.S. at 804). In this case, the government makes no argument against application of the exclusionary rule, and that is for good reason. The gun undeniably constitutes primary evidence obtained as a direct result of the unconstitutional search. It therefore must be suppressed. Meanwhile, the government's remaining evidence—the pill bottle, drug evidence, and cash—is derivative of the illegality. If not for the improperly obtained gun, the officers would not have had probable cause to arrest Johnson, which means that they would not have had the legal justification to perform the second search that resulted in the unearthing of the other evidence. In other words, the illegal first search was the "but-for cause of the discovery" of the remaining evidence. *United States v. Brodie*, 742 F.3d 1058, 1062 (D.C. Cir. 2014). That evidence must be suppressed as well.

## IV. CONCLUSION

For the foregoing reasons, Johnson's Motion to Suppress Physical Evidence is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: February 4, 2019

RUDOLPH CONTRERAS
United States District Judge